J. Heppingstone *vs.* J. Mammen.

November 25, 1863.

## SUPREME COURT—IN ADMIRALTY.

### John Heppingstone *vs.* John Mammen.

The boats of a whaleship in the Northern Seas pursued and got fast to a bowhead whale, and after repeatedly lancing it, were obliged to cut from it, and night coming on, relinquished the pursuit, returning to the ship. The following morning a whale was seen from the mast-head, which subsequently proved to be the same as that wounded the previous evening, and the pursuit was resumed; but the boats of another ship nearer the whale, had already commenced pursuit of the same whale, and afterwards succeeded in killing it, though warned by the officers of the first ship that it had been previously attacked by them, and some of their irons were found in its carcass. The whale was given up to the first ship. Upon the question as to the division or share, if any, to be awarded to the second vessel: *Held,* that the rule of the common law, touching the rights of pursuers and captors of animals *feræ naturæ,* did not apply to cases like the present arising on the high seas, but in the absence of any positive rule of maritime law, the Court was bound to decide ac-

cording to equity and natural right. And that as the whale had at first been partially disabled by the crew of the first vessel, and a diligent search maintained, though finally killed by the boats of the second ship, it might be regarded as the joint prize of both ships, and the Court decreed the libellant one-half of the proceeds (oil and bone.)

At Chambers, before Justice ROBERTSON.

The libellant is master of the whaling bark " Richmond," of New Bedford, and the respondent is master of the Oldenburg whaleship ". Oregon." The object of the libel is to recover the whole, or a share of the proceeds of a whale, known to whalemen as a "bowhead," captured in the Sea of Ochotsk on the 30th of May last, which yielded one hundred and fifty barrels of oil and two thousand pounds of whalebone. The evidence in the cause is very lengthy, and somewhat conflicting, as might be expected when many of the witnesses are interested parties, and I will state, with a view to a proper understanding of the decision, what I regard as having been proven in substance.

Late in the afternoon of the 29th of May, while the boats of the "Oregon" were down, one of her officers descried a whale, and the boats going in pursuit, one of them struck and got fast to it. The whale ran so fast that the other boats were unable to get up to it. There was a good deal of floating ice around. After the first boat had been fast to the whale for about two hours, during which time it had been lanced once or twice, and showed thin blood in its spout, the boat was dragged against some ice too thick to be penetrated, so that the line had to be cut, and the whale disappeared. It was then about sundown. The three boats waited a few minutes, but as nothing was seen of the whale, the officers resolved to return to the ship. Unexpectedly, the whale rose again between the boats and the ship. Mr. Costa fastened to the whale again, but his boat got stove. Upon a signal being made, two fresh boats were lowered from the Oregon. Mr. Lupson fastened to the whale, while Mr. Allen picked up Mr. Costa and his crew. Mr. Allen pulled up near the whale and shot a bomb-lance into it, causing it to show blood freely in its spout, and then pulled to the ship. The whale came near the ship, and Mr. Allen fastened to it, just as it was going down. When it rose again Mr. Terry struck it, making three boats fast. Mr. Lupson's boat got into a strip of

ice and had about four hundred fathoms of line out. Mr. Allen gave the whale a bomb-lance. Mr. Terry gave it a hand-lance and got his boat stove. Mr. Allen succeeded in lancing the whale again, and it appeared disabled. The ship was within a quarter of a mile, and it was dark. Mr. Terry and his crew were in the water calling for help, and Mr. Allen cut his line and went and picked them up, carrying them to the ship. Respondent ordered Mr. Allen off again in pursuit of the whale, and on approaching Mr. Lupson, who was still in the ice, he told him he was still fast to the whale, but on hauling in his line, it appeared that one of his harpoons had drawn from the whale, and the warp of the other had been cut by the ice. The whale had disappeared, but the officers, expecting that it would die before daylight, stuck a boat's mast with a waif on a cake of ice to mark the place where they had last seen it. They returned to the ship at ten o'clock. During the darkness the ship was kept near the spot, and by three o'clock Mr. Costa lowered a boat and went in search of the whale. By six o'clock he returned on board with the waif, which he had found, but had seen nothing of the whale. It was foggy till about half-past nine, when Mr. Costa went aloft with a spyglass, on the lookout. The ship was steered in the direction it was thought the whale might have taken. After Mr. Costa had been aloft for about an hour, he saw a whale on the lee bow, heading to windward, and immediately after called out that a bark ahead, some three miles off, and on the opposite tack, was lowering her boats. Capt. Mammen went aloft and taking the spyglass said he thought he saw something sticking on the whale's back. He ordered Mr. Allen and Mr. Lupson to lower their boats, telling the former to warn the "Richmond's" boats off if it should prove to be the missing whale. Mr. Allen and Mr. Lupson went along under sail, but the whale having got to windward of the boats, they took to their oars, Mr. Allen hoisting a waif. When the whale went down again Mr. Allen got up to Captain Heppingstone's boat, and asked him if the whale had harpoons in its body, to which the latter replied that he thought it had, Mr. Allen told him he thought it was the same whale the "Oregon's" boats had been obliged to cut from the previous night, and that there were four or five harpoons in its body. Libellant

called to his officers to strike the whale if they got an oppor-
tunity to do so. It rose behind a point of ice, near the boat of
Mr. Rogers, the third mate of the "Richmond," and he fasten-
ed to it. The whale did not sound, but ran a short distance
near the surface, when Mr. Rogers lanced it several times, as
did also a boatsteerer of another of the "Richmond's" boats,
mortally wounding it. Mr. Allen pulled close to it, and his
boatsteerer said he recognized their harpoon poles in its body.
Allen then told libellant that he was sure it was the same whale.
Libellant asked him if their harpoons were marked. Allen
told him some were marked and some not. He replied that if
the harpoons had the "Oregon's" mark, that would prove it
was their whale, or the whale they had struck, or something
like that. The whale got under a piece of ice, and Rogers was
obliged to cut his line, but it came up after a time in a patch of
clear water, and Rogers, having got round the intervening ice,
killed it. Libellant and the officers of the "Oregon" then held
a parley, and proceeded to cut out some harpoons. The first
one found had no mark, but the second and third had the "Ore-
gon's" marks. Libellant proposed to Mr. Costa to let him have
half the whale, but the latter said libellant had better go on
board the "Oregon" and speak to the respondent. Libellant
said he did not know that by law he could demand half, but
thought he ought to have it, and, giving orders to his officers
to assist in towing the whale clear of the ice, pulled away to-
wards the "Oregon," saying he did not give up the whale till
he had seen the respondent. Libellant went on board and saw
the respondent, who refused to give him half the whale, where-
upon libellant left, saying he would see about it at Honolulu,
and soon after signalled his boats to repair on board the "Rich-
mond." Mr. Wilcox and the libellant have testified that the
respondent, since the return of the ships to Honolulu, admitted
in conversation with them, that his boats could not have secur-
ed the whale without the aid of the "Richmond's" boats, but
respondent denies that he ever meant to make such admission.

The case is a novel one in this Court, and somewhat perplex-
ing. The several masters of whaleships who have testified in
the cause, concur in saying that they have never known a case
precisely like this. According to the English common law doc-

trine, exclusive property in animals *feræ naturæ,* may be acquired by their immediate manucaption, or by taking and killing them ; and also by the wounding of them, by one not abandoning his pursuit, in such a way as to prevent their escape and bring them within his certain control, and by encompassing them with nets and toils, or otherwise intercepting them, so as to deprive them of their natural liberty and render escape impossible. But merely starting and pursuing them gives no right of property ; and therefore an action cannot be supported against one who intercepts and kills them in the view of the pursuer, while he is continuing the pursuit. (See Bacon's Abr., Vol. 4, page 431 ; Buster *vs.* Newkirk, Johnson's Rep., Vol. 20, page 74.)

It is argued on behalf of the libellant, that, if the present case is to be governed by the doctrine just referred to, the whale belonged to the "Richmond," because her men found it loose, attacked and killed it. On the other hand, it is contended that the English common law rule should not be held applicable to such a case, and even if it were that the whale belonged to the "Oregon," whose men first attacked and wounded, and afterwards resumed the pursuit of it, before the "Richmond's" men struck it. If the case were to be decided by the strict rules of the common law, it might be said that the libellant, having voluntarily parted with the possession of the whale to the respondent, with a full knowledge of all the facts, had precluded himself from maintaining an action to recover back the proceeds of the whale for himself or the owners. But I am of opinion that the rules of the common law, *eo nomine,* are not applicable to any branch of the case ; and it is admitted, on behalf of the libellant, that the doctrine quoted above has been modified to some extent, by the universal usage prevailing in the whaling business, so as to affect the decision of this case on its merits. Further, although the rule of the common law touching animals *feræ naturæ,* may be considered recognized here, so as to govern cases arising within the Kingdom, the Court is not bound to apply that rule to cases arising on the high seas, but in the absence of any positive rule of maritime law, is bound to decide according to equity and natural right. The libellant did not claim the entire whale, but said he considered himself fairly en-

titled to a half of it, and when he relinquished the possession to the respondent, he did so with an intimation that he intended to assert his claim to that extent upon the return of the ships to port. It would be unjust therefore to debar him from doing so, by a technical rule. It is better that, when such cases occur in the remote regions where the whalemen of different nations pursue their prey, the parties should feel that it is not necessary to maintain what they may conceive to be their rights by resorting to force, but may safely leave the adjustment of those rights to a Court of Admiralty, whose duty it is in general, as a matter of comity, to judge and administer civil justice in maritime concerns, between the citizens or subjects of any friendly nation, exhibiting a cause within its jurisdiction.

According to the usage which prevails among whalemen, as I understand it from the evidence, if the "Richmond" had fallen in with the whale dead, having died of the wounds inflicted on it by the "Oregon's" men the previous evening, and the respondent had arrived and asserted his claim to it, before it was "cut in," the libellant must have given it up. But if the "Richmond" had fallen in with the whale wounded, as it was, lowered her boats and killed it before the "Oregon's" boats had joined in the pursuit, the whale would have belonged exclusively to the "Richmond." What makes the difficulty in the case is that, before the "Richmond's" officer struck the whale, the boats of the "Oregon" had joined the pursuit, and her officers had warned the libellant that they had reason to believe it was the same whale that they had lost sight of during the night, with several of their harpoons in its body. Of course, the libellant was not therefore bound to refrain from endeavoring to kill the whale, because the "Oregon's" officers might have been mistaken. It might have been a different whale, for there were other ships within sight. But just after the whale was struck, Mr. Allen pulled close to it, so that his boatsteerer recognized the "Oregon's" harpoon poles in the whale's blubber, and then Mr. Allen told the libellant he was certain it was the "Oregon's" whale. It is contended therefore on behalf of respondent, that when the libellant, after that warning, allowed his officer to go on and kill the whale, he did so merely upon the possibility that, after all, it might be found that the harpoons

in the whale's carcass were not marked with the "Oregon's" brand, in which case the libellant might have retained the whale.

On the other hand, it is argued with a good deal of force that when the whale was first seen from the "Richmond," it was enjoying its natural liberty, a fair prize to the first captor, not being even pursued by any one, and that her boats were first lowered in pursuit. It is true that active pursuit, on the part of the "Oregon," had been relinquished when the whale became lost in the darkness of the previous night, for pursuit implies that the game is in sight. But after pursuit became possible, the "Oregon" maintained a diligent search for the missing whale, and as soon as it was again discovered, resumed its active pursuit. Were it not for the fact that the officers of the "Oregon" had joined in the pursuit with the means for capturing the whale, and given notice to the "Richmond's" officers before they struck it, I should feel it my duty without hesitation, to hold that the whale belonged to the "Richmond." It is said that the whale being free, the boats of the two ships joined in pursuit on equal terms, and some evidence has been given tending to show that, as the usage is understood among whalemen, particularly in American ships, even under all the circumstances of this case, the libellant had a right to capture the whale if he could, and to retain it. I am not satisfied that the usage has been proven to exist so as to sustain the libellant's claim to that extent, and if it were, I should deem it unreasonable. Supposing the libellant had retained possession of the whale and cut it in, the respondent assenting under protest, and intimating his intention of litigating the matter at Honolulu, I should have thought it unjust to deny his claim to at least a half of the whale. His crew underwent the peril of the first attack, wounded and partially disabled the whale, rendering its final capture less difficult, and with stoven boats, were obliged by the darkness to give up the pursuit, but on the whale being again discovered, resumed the pursuit with a fair prospect of success, and would it have been held then that respondent had no right to any part of the proceeds? I think not.

The question now is, can the respondent, in equity and good conscience, retain the whole, or is the libellant justly entitled

to a share of the spoil? True, the usage of the whaling business has so far modified the common law rule, that the officers of the "Oregon" need not have unremittingly kept up the pursuit, and wounded the whale to such a degree as utterly to prevent its escape and bring it within their *certain* control, in order to preclude the claims of other pursuers. If they had been seen fast to the whale, for instance, although its capture was still quite uncertain, or, even if they had been seen to cut loose from it, but maintaining an active pursuit, the officers of the "Richmond" would not have been justified by the usage, under those circumstances, in capturing and retaining the whale. But the whale was free, although wounded, going to windward towards the ice at a good pace. The chances for its escape were rather in its favor, and he would be a rash man and a foolish, who would say on his oath, that he would certainly have captured that whale, for it is emphatically true, in the pursuit of whales, that "there is many a slip 'twixt the cup and lip." When Mr. Allen was pressed upon that point, he went no farther than to say, that he thought the "Oregon's" boats had as good a chance to secure the whale as the "Richmond's." When the whale was struck by Rogers, it was behind the first streak of ice, and after having been repeatedly lanced it succeeded in getting under a thick piece of ice farther to windward, and Rogers was obliged to cut adrift from it, so that, as some of the parties have testified, they thought it very doubtful if they should ever see the whale again. But it did rise again, farther in between the streaks of ice, and Rogers, having succeeded in getting his boat into the place, again struck, and killed the whale.

It seems to me, that, under all the circumstances of the case, the whale may fairly be considered the joint prize of both ships; and I shall, accordingly, decree that the respondent deliver to the libellant seventy-five barrels of good bowhead oil and one thousand pounds of whalebone, of at least medium size, and that the costs be equally divided.

Mr. Harris, for libellant.

Mr. Montgomery, for respondent.